**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | No. CR 10-2281-TUC-DCB (JM) |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Ismael R. Loreto and Francisco Javier, ) | |
| Teran ) | |
| ) | |
| Defendants. ) | |
| _____) | |

Pending before the Court are a Motion to Suppress Statement (Doc. 29) and a Motion to Dismiss for Due Process Statutory Notice Violation (Doc. 32) filed by Defendant Ismael Loreto. Defendant Francisco Javier Teran joined in the Motion to Dismiss (Doc. 42). The government responded to the Motion to Dismiss (Doc. 41) and to the Motion to Suppress (Doc. 48). No replies were filed.

The Defendants' motion were set for hearing and evidence was heard on December 3, 2010. (Doc. 55 (Transcript)). The Defendants were present and represented by counsel. The government presented testimony from agents Rustin Wayas and Paul Brostko from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Defendant Ismael Loreto testified on his own behalf. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement. Having now considered the motions, the Magistrate Judge recommends that the District Court, after its independent review, DENY both motions.

## I. Factual Findings

### A. ATF Agents' Testimony

ATF Agent Paul Brostko, who was sometimes assisted by Agent Rustin Wayas, had been conducting surveillance in relation to the suspected straw-purchase of weapons and ammunition and trafficking of firearms into Mexico. (Tr. 20, 39-40). Initially, the surveillance involved Defendant Teran and then later included Defendant Loreto after he was seen with Teran. (Tr. 20-21). After the agents gathered additional information about Teran and Loreto, they arrested Teran and decided to interview Loreto. (Tr. 40-41).

On August 19, 2010, Agents Brostko and Wayas, who were dressed in t-shirts and jeans and carrying concealed weapons, went to Loreto's home and knocked on the door. (Tr. 9, 16-17, 43-45). When Loreto answered the door, the agents identified themselves as ATF agents, showed him their identification, and told him that they wanted to talk about three firearms he had purchased a few months earlier, two at the end of May and one at the beginning of June. (Tr. 10, 23,45). Loreto began talking to the agents while they were at the front door and Agent Brostko asked him if he had heard that Defendant Teran had been arrested, to which Loreto replied in the affirmative. (Tr. 10, 12). Loreto then asked them inside to talk. (Tr. 10).

The agents entered the house into the living room. (Tr. 11). They asked Loreto if anyone else was in the home and Agent Brostko asked if he could check the rest of the house to see for himself that nobody else was present. (Tr. 11, 46). After a quick look around, Agent Brostko returned to the living room and the men sat down, with Loreto sitting on a couch and the agents sitting across from him. (Tr. 11-12, 47). The agents, with Agent Brostko taking the lead, then began questioning Loreto about the weapons and who had paid for them. (Tr. 12-13, 47). Agent Wayas described Loreto, at least at the beginning of the interview, as friendly, direct and concise in his answers. (Tr. 13-14). However, after Agent Brostko asked questions about what had happened to the firearms Loreto had purchased earlier in the year, Loreto explained that he had sold the weapons at a gun show at the Pima

1  County Fairgrounds. (Tr. 14, 51). Wayas believed that the explanation was untrue as there
2  was no gun show at the fairgrounds during the time period in question. (Tr. 14, 54). When
3  confronted about the truthfulness of his statements, and asked to tell the truth, Loreto's
4  demeanor changed and he said "you know what, I need to get my story straight and I don't
5  want to talk to you guys anymore." (Tr. 14, 55, 81). At that point, the interview, which had
6  lasted ten or fifteen minutes, was concluded and the agents left. (Tr. 14, 17-18, 53).

7  **B.      Defendant Loreto's Testimony**

8  Loreto is 30 years old and has an associates degree in drafting and design. (Tr. 67-
9  68). He was not employed at the time of the incident, but currently has a job. (Tr. 68). His
10 only substantial contact with law enforcement prior to this case involved a DUI. (Tr. 67).
11 Loreto indicated that he had bought and sold firearms previously, and was not afraid of guns
12 if he is the one that has them. (Tr. 83). He did not have a gun on the day in question. (Tr.
13 83).

14 On August 19, 2010, Loreto was in his bedroom when his doorbell rang. (Tr. 68-69).
15 He went to his living room to answer the door and saw one man, later identified as Agent
16 Wayas, looking through a side window of his house, and another man, later identified as
17 Agent Brostko, standing outside the window next to his door. (Tr. 69). When he opened the
18 door, Agent Wayas came from around the house and Loreto saw their badges and was
19 thinking, "I'm in trouble." (Tr. 69-70). As he opened the door, the agents identified
20 themselves as being from the ATF and, as they were walking into his house, asked if they
21 could come inside. (Tr. 70).

22 Once the agents were inside the house, Loreto, who knew he had done nothing
23 wrong, did not feel he had a choice and told them to come in. (Tr. 70-71). As they were
24 coming inside, Agent Borostko told Loreto to take a seat on the couch and then began
25 looking around the house while simultaneously asking Loreto if he could do so. (Tr. 71-72).

26 All three of the men then sat in Loreto's living room, Agent Borostko sat across from
27 him, six to eight feet away, and Agent Wayas sat about four feet away on the same L-shaped

28

1  couch upon which Loreto was seated. (Tr. 75-76). Agent Brostko, who was particularly
2  intimidating, took the lead on questioning Loreto and at times would talk over him if he did
3  not like Loreto's response. (Tr. 74). Loreto asked the agents if they wanted water and they
4  declined and told him to take a seat and he did so because, "[t]hey're the guys with the guns."
5  (Tr. 75). When Loreto's cell phone rang, Agent Wayas told him to "let it go." (Tr. 73).
6  Eventually, Loreto told the agents he no longer wished to talk because he wanted "to get his
7  story straight." (Tr. 81). Nevertheless, the agents asked him a "couple more questions."
8  (*Id.*). Agent Borostko also told him that if he had any more information to share, he needed
9  to contact Agent Borostko by September 1, 2010 or "he was going to put some subpoena or
10 something," and Loreto told him to go ahead because he had nothing to worry about. (Tr.
11 81). Loreto could not say how long the interview lasted, indicating only that, "it felt like
12 hours." (Tr. 74).

13 During the interview, Loreto was never told he was under arrest or free to walk away.
14 (Tr. 75). Although Loreto believed he had done nothing wrong, he felt intimidated because
15 the agents were invading his privacy. (Tr. 80). He would have been much more comfortable
16 if they had stayed outside and had not looked through his house. (Tr. 80). However, Loreto
17 admits that he was not so intimidated that he felt he could not tell the agents he no longer
18 wanted to talk with them. (Tr. 84).

19 **II.    Motion to Suppress**

20 Defendant Loreto seeks an order suppressing his statements to agents Brostko and
21 Wayas because the statements were made without him first being provided *Miranda*
22 warnings and also because the statements were involuntary. It is not disputed that Loreto
23 was interrogated and made incriminating statements without the benefit of *Miranda*
24 warnings. However, not every statement obtained without first administering *Miranda*
25 warnings is inadmissable because "police officers are not required to administer *Miranda*
26 warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495
27 (1977). Only a person who is questioned by law enforcement after being "taken into custody
28

- 4 -

or otherwise deprived of his freedom of action in any significant way" must first be provided the warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### A. Loreto was not in custody.

When a suspect has not been formally arrested and taken into police custody, he is nonetheless "in custody" so as to be entitled to the warning prescribed by the *Miranda* decision if he has been "deprived of his freedom of action in any significant way." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444). In making this determination, a court looks at the totality of the circumstances and asks whether a reasonable person in those circumstances would have felt at liberty to terminate the interrogation and leave. *Id.* (citations omitted). In *Craighead*, the Ninth Circuit recognized that the consideration of this standard is complicated when applied to interrogations that occur in a suspects home because the ability to leave is difficult to analyze because the suspect would be forced to leave his own home in order to terminate the interrogation. 539 U.S. at 1082-83. Nevertheless, in such contexts, the court offered this non-exhaustive list to aid courts in determining whether an in-home interrogation was custodial:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.* at 1083. Other pertinent considerations can include the extent to which the defendant is confronted with evidence of guilt and the duration of the detention. *United States v. Beraun-Perez*, 812 F.2d 578, 580 (9th Cir. 1987).

Here, there were only two law enforcement personnel involved in the interrogation. Agent Wayas explained that it is ATF's policy for officer safety to have two agents present during interrogations. (Tr. 8). Given the nature of the investigation, it is hardly questionable that the policy is reasonable. Moreover, the cases cited in *Craighead* in support of a finding

- 5 -

1 a suspect "in custody" all involved more than two officers. *See United States v. Mittel-*
2 *Carey*, 493 F.3d 36, 38, 40 (1st Cir. 2007) (eight officers, one of whom unholstered his gun);
3 *United States v. Revels*, 510 F.3d 1269, 1270 (10th Cir. 2007) (seven officers); *Sprosty v.*
4 *Buchler*, 79 F.3d 635, 638, 642 (7th Cir. 1996) (five officers, one of whom was visibly armed
5 and in uniform). Both the officers were armed in this case, but as the cases cited in
6 *Craighead* indicate, weapons that are in site or unholstered present a significantly heightened
7 concern that a suspect is in custody. Although Loreto stated that he knew they were armed
8 because the weapons at times "bulged" through the agents clothing, Wayas testified that their
9 firearms were not visible. (Tr. 32). Even if Loreto did see the agents' weapons, it is
10 undisputed that the agents were wearing plain clothes, that their weapons were in their
11 waistbands and were never mentioned or unholstered.

12 The second *Craighead* consideration is whether the suspect was ever restrained by
13 physical force or threats. There is no evidence here that Loreto was restrained. The
14 questioning occurred while Loreto sat on the couch in his living room. Loreto testified that
15 the agents told him to ignore a phone call, and declined his offer of water; however, the
16 agents did not recall his phone ringing and described Loreto as friendly and their behavior
17 as neither intimidating nor threatening. (Tr. 8-9, 15). Until the interview ended, Loreto
18 never appeared to Wayas to be uncomfortable or unwilling to talk (Tr. 37-38), and did not
19 appear fearful or nervous. (Tr. 54). This testimony is entirely consistent with the fact that
20 Loreto only once told the agents once that he was no longer willing to talk and that the
21 interrogation was then terminated. (Tr. 15). There is no evidence of restraint.

22 The third factor is whether the suspect was isolated from others. Unlike the defendant
23 in *Craighead*, Loreto was not taken to an isolated portion of his residence and remained in
24 the living room which was described as immediately inside the front door of the home.
25 Although there was nobody in the home besides Loreto and the officers, there was no
26 affirmative act by the officers to isolate him from any visitor that may have arrived. To the

27
28
- 6 -

extent this consideration is relevant to Loreto's circumstances, it is favorable to a finding that he was not in custody.

Fourth, the Court must determine whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. While not expressly told he could terminate the interview, Loreto's actions belie any claim that the atmosphere was one in which a reasonable person would believe they were not free to do so. The interview lasted only ten or fifteen minutes and then Loreto told the agents that he did not want to answer their questions. Although Loreto indicated that the agents nevertheless asked him "a couple more questions" (Tr. 81), something the agents deny, it is undisputed that the questioning stopped shortly thereafter. Although Loreto was not told he could terminate the questioning, the inquiry is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Given that Loreto was not restrained and that the interview was terminated at Loreto's request, the circumstances indicate that a reasonable person would have been aware of his ability to terminate the interview.

The final pertinent considerations are the extent to which the defendant is confronted with evidence of guilt and the duration of the detention. From the testimony of both the agents and Loreto, the bulk of the interview involved a discussion of how he obtained the three weapons in question and what he did with them. It was only when Loreto claimed to have sold them at a gun show held at the Pima County Fair Grounds that Agent Wayas challenged his assertion. It was then that Loreto terminated the interview so that he could get his story straight. All this lasted no more than fifteen minutes and do not militate in favor of a finding that he was in custody during questioning.

Applying the factors cited in *Craighead* and *Beraun-Perez*, the interrogation inside Loreto's home was not custodial and he was thus not entitled to *Miranda* warnings.

- 7 -

**B.     Loreto's statement was voluntary.**

Despite a finding that *Miranda* warnings were unnecessary, the question remains whether Loreto's statements were not made voluntarily. "Only voluntary confessions are admissible." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). The government must prove voluntariness of a confession by a preponderance of the evidence. *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical of psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002) (citation and internal quotation marks omitted). "Psychological coercion is equally likely to result in involuntary statement and is just as forbidden as violent or physical interrogation tactics." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991).

A confession is not free and voluntary if "obtained by any direct or implied promises, however slight. Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." *Shotwell Manufacturing Co. V. United States*, 371 U.S. 341, 347-48 (1963). To be improper, however, the promise must be sufficiently compelling to overbear the suspect's will in light of all the attendant circumstances. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). For example, an interrogating agent's promise to inform the prosecutor about a suspect's cooperation does not render a statement involuntary, even when accompanied by a promise to recommend leniency or by speculation that the cooperation will have a positive effect. *Id.*

Loreto argues that his statement was involuntary because the agents intimidated him into talking with them. He relies on many of the same facts he cited in support of his argument that he was under arrest. Specifically, he says that the officers essentially "bum rushed" him by coming in his home and looking around. He also says he was intimidated because they were armed, sat down on both sides of him, and refused to let him answer his

- 8 -

1  phone or get water. (Tr. 87). Additionally, he argues that his statements were involuntary
2  because he was told he could "help himself" by providing information and told him that the
3  government "was not interested in prosecuting people who assisted the government." *Motion*
4  *to Suppress*, p. 8.

5  Loreto is 30 years old and has an associates degree in drafting and design from ITT
6  Tech. (Tr. 68). Both agents testified that Loreto invited them into the house and even Loreto
7  admits that he offered them water. (Tr. 75). They sat in the living room, where Agent
8  Brostko sat six to eight feed away in front of Loreto and Wayas sat at the other end of an L-
9  shaped couch. (Tr. 76). When questioned about inconsistencies in his story, Loreto
10 discontinued the interview and admitted that he was not too intimidated to tell them he no
11 longer wanted to talk. (Tr. 84). The interview lasted less than fifteen minutes. (Tr. 14, 17-
12 18, 53).

13 Additionally, other than the agents' denial of making any promises that might induce
14 Loreto to talk (Tr. 15-16, 56), there is little evidence of any intimidation or promise that he
15 would not be prosecuted, would face reduced charges, or get a more lenient sentence. *See*
16 *Leon Guerrero*, 847 F.2d at 1367. Here, the agents made no promises of specific and
17 tangible benefits, and the only allegation that suggests any possible benefit was Loreto's
18 claim that Agent Borostko told him to contact him by September 1, 2010. Loreto recalled
19 that in setting the September 1 deadline, Borostko said he would be subpoenaed, but the
20 Court raised the question of whether this threat related to the indictment, which indeed was
21 filed on September 1, 2010. (Tr. 85). Although both sides argued the implications of the
22 timing of the indictment, ultimately it is largely irrelevant to the issue of voluntariness. It is
23 undisputed that the interview was complete when Agent Borotsko allegedly made this
24 statement to Loreto. Additionally, there was no testimony indicating that Loreto contacted
25 Agent Borotsko between the time of the August 19 interview and the September 1
26 indictment. As such, the Borotsko's statement, even if it did threaten indictment, did not

- 9 -

induce any statement from Loreto. Thus, looking at the totality of the circumstances, the preponderance of the evidence establishes that Loreto's statement was voluntary.

## III.  Motion to Dismiss

In Loreto's motion to dismiss, in which Teran has joined, he argues that the offenses charged against him in Counts One and Two of the Indictment, making false statements during the purchase of a firearm in violation of 18 U.S.C. § 924(a)(1)(A), are vague because Chapter 44 of Title 18 does not contain any explicit information regarding whether a purchaser of a firearm intends to sell the firearm to another.

As Loreto's counsel candidly informed the Court, this argument was addressed and rejected by Magistrate Judge Guerin in *United States v. Torres*, CR 09-1733 (D. Az. filed Aug. 12, 2009). In her convincing Report and Recommendation, Judge Guerin first noted that 18 U.S.C. § 923(g) specifically provides that "each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General by regulations prescribe." Then, after noting that the referenced regulations were prescribed in 27 C.F.R. § 478.124(a) and require the completion of ATF Form 4473 prior to the purchase of a firearm, Judge Guerin offers the following analysis:

> Form 4473, crated by the Bureau of Alcohol, Tobacco and Firearms, specifically asks the firearm purchaser: "Are you the actual buyer of the firearm(s) listed on the form?" *See* Form 4473, available at http://www.atf.gov/applications/e4473/download.html. The form goes on to state, in bold print: "**Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** See Important Notice 1 for actual buyer definition and examples."." *Id.* The Important Notice 1 for actual buyer definition and examples.). *Id.* The Important Notices attached to Form 4473 state at paragraph 1:
>
>> For purposes of this form, you are the actual buyer if you are purchasing this firearm for yourself or otherwise acquiring the firearms for yourself (for example, redeeming the firearm

- 10 -

> form pawn/retrieving it from consignment). You are also the actual buyer if you are acquiring the firearm as a legitimate gift for a third party. Actual Buyer Examples: Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith, Mr. Smit give Mr. Jones the money for the firearm. Mr. Jones is NOT the actual buyer and must answer "no" to question 12a."

*Torres*, CR 09-1733 at Doc. 107 (Report and Recommendation).

Based on this analysis, the Court agrees with Judge Guerin that 18 U.S.C. § 924(a)(1)(A) is part of a "readily understandable statutory and regulatory scheme that places firearms purchasers on notice that they are required to accurately report whether they are purchasing the firearm for someone else." *Id*. Therefore, the Court finds that there is no due process violation in the indictment and recommends that the motion to dismiss be denied.

### IV.     RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2), Rules of Practice of the United States District Court, District of Arizona, it is recommended that the District Court, after an independent review of the record:

1. **Deny** the Motion to Suppress filed by Defendant Loreto (Doc. 29); and
2. **Deny** the Motion to Dismiss Counts One and Two, filed by Defendant Loreto (Doc. 32), in which Defendant Teran joined (Doc. 42).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. However, the parties shall have **fourteen (14) days** from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. If any objections are filed, this action should be designated case number: **CR 10-2281-TUC-DCB**. Failure to timely file objections to any factual or

. . . .

. . . .

. . . .

- 11 -

1  legal determination of the Magistrate Judge may be considered a waiver of a party's right to
2  *de novo* consideration of the issues.  *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121
3  (9th Cir. 2003) (*en banc*).

4  **DATED this 15th day of December, 2010.**

*/s/ Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge

- 12 -